JS 44 (Rev. 10/20) TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Shenita Cleveland

**(b)** County of Residence of First Listed Plaintiff **Dallas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Billy Clark, The Clark Law Firm, P.O. Box 4682, Cedar Hill, TX 75106, 214-725-2750 (p), 877-312-5118 (f)

## DEFENDANTS

City of Dallas, Texas, Chief Ulysha Renee Hall, and John Doe Police Officers 1-50

County of Residence of First Listed Defendant **Dallas**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC § 1983
Brief description of cause:
Violation of Civil Rights, First Amendment U.S. Constitution

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE _____ DOCKET NUMBER _____

DATE
May 26, 2022

SIGNATURE OF ATTORNEY OF RECORD
*Bill Clark*

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHENITA CLEVELAND, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CIVIL CAUSE NO. 3:22-cv-1154 |
| vs. | § | |
| | § | |
| | § | |
| CITY OF DALLAS, TEXAS, CHIEF | § | |
| ULYSHA RENEÉ HALL, AND | § | |
| JOHN DOE POLICE OFFICERS 1-50 | § | |
| | § | |
| Defendants. | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT & JURY DEMAND

---

Plaintiff Shenita Cleveland brings this civil action against the City of Dallas, Texas, a

political subdivision, Chief Ulysha Reneé Hall in her individual capacity, and John Doe Police

Officers 1–50 in their individual capacities.

## I.     INTRODUCTION

1.      In the wake of the brutal and unjustified May 25, 2020 killing of George Floyd by

police officers in Minneapolis, Minnesota, hundreds of thousands of Americans have taken to

public streets and forums to protest police brutality and racial inequality. Dallas has been no

exception, with peaceful protests occurring all across the city every single day since May 29,

2020 (collectively referred to as the "2020 Protests"). Undeterred by the fact that police

officers' use of excessive force is the very subject of these demonstrations, City of Dallas Police

Department ("Dallas Police" or "DPD") officers have repeatedly used extreme and lethal force

against these crowds over the past thirteen days, targeting peaceful, non-threatening protesters

and bystanders with tear gas, smoke bombs, flash-bangs, Pepper Balls, mace, and what are known

as "kinetic impact projectiles," or "KIPs." And without regard to the ongoing global pandemic involving respiratory disease COVID-19, police have tear-gassed and smoke-bombed protesters, many of whom may have already been infected with Covid-19, making them all the more likely to suffer simply because they exercised their First Amendment rights. This is perhaps made most painfully evident by that fact that George Floyd was posthumously diagnosed by the medical examiner with coronavirus.

2.      Kinetic impact projectiles, which include so-called "rubber bullets" or "sponge bullets," are often used by American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens—praise these bullets as being "nonlethal" or "less lethal." They are not. In fact, these KIPs kill approximately three percent of all people they strike.

3.      Plaintiff Shenita Cleveland is a Black American and resident of Texas. This week, Plaintiff peaceably attempted to exercise her First Amendment right by participating in the 2020 Protests for reforming policing tactics and resolving racial injustice in Dallas. And in doing so, Plaintiff became victim of the very same unjustified and horrific police brutality she was demonstrating against. Specifically, Plaintiff was very seriously injured when Dallas Police officers, unprovoked, shot her with so-called "less lethal" rubber or sponge bullet KIPs. Over the course of three days in Dallas, Plaintiff's toe was broken and she also sustained a very serious injury to her thigh and ankles.  Plaintiff was left injured and handcuffed in the middle of a street for several hours while suffering from a broken toe and other injuries to her leg. Many other people were also severely injured by these "less lethal" bullets in Dallas this week, including a 26-year-old Brandon Saenz who permanently lost his left eye and a young woman who was shot in the forehead while walking home from a grocery store.

4. This is a civil action for monetary relief for injuries Plaintiff sustained as a result of the acts and omissions of Defendants the City of Dallas, Chief of Police Ulysha Reneé Hall, and John Doe Police Officers 1-50. These Defendants, both individually and collectively, were responsible for the excessive use of force against Plaintiff and her physical injuries and constitutional violations of their First, Fourth, and Fourteenth Amendments. These injuries are the direct result of official policies of the City and failures by the City and Chief Hall to implement and enforce policies and standards that ensure Dallas Police officers know and are trained in the constitutional limits of force against civilians, particularly those exercising their First Amendment rights.

5. In addition to this action for monetary relief, Plaintiff is also seeking in this lawsuit an injunction against Defendants to enjoin them from any future use of tear gas, other chemical agents, and rubber or sponge bullets KIPs in the future.

## II. PARTIES

6. Plaintiff Shenita Cleveland is an individual resident of Cedar Hill, Texas and an African American woman.

7. Defendant the City of Dallas, Texas is a political subdivision of the State of Texas and operates and controls the Dallas Police Department. Defendant the City of Dallas, Texas can be served with process by serving the City Attorney Christopher J. Caso and Executive Assistant City Attorney Tatia R. Wilson, at the Dallas City Attorney's Office, 1500 Marilla St., 7DN, Dallas, Texas 75201. Executive Assistant City Attorney Wilson has stated that she will accept service on behalf of the City of Dallas, Texas.

8. The Defendant John Doe Police Officers 1–50 are City of Dallas Police Officers.

9. Defendant Ulysha Reneé Hall is the Chief of Police of the Dallas Police

Department and the supervisor, and policymaker for John Doe police officers at all times relevant

in this complaint. Defendant Chief Hall can be served with process at the Dallas Police

Department Jack Evans Police Headquarters, 1400 S. Lamar Street, Dallas, Texas 75215, and by

serving Executive Assistant City Attorney Tatia R. Wilson, at the Dallas City Attorney's Office,

1500 Marilla St., 7DN, Dallas, Texas 75201. Executive Assistant City Attorney Wilson has stated

that she coordinate to facilitate Chief Hall's waiver of service of the summons.

### III.    JURISDICTION

10.    Plaintiff reallege and incorporate by reference the allegations contained in the

preceding paragraphs.

11.    Federal jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and

42 U.S.C. § 1983.

12.    The Court has general personal jurisdiction over Defendants the City of Dallas,

Chief Ulysha Reneé Hall, and John Doe Police Officers 1–50 by virtue of their citizenship and

residence in Dallas County, Texas, as well as their continuous and systematic contacts with the

state of Texas. Defendant the City of Dallas is a municipality incorporated in the State of Texas.

Upon information and belief, Defendants Hall and John Doe Police Officers 1-50 are residents of

the state of Texas. Defendant Hall was the Chief of Police of the Dallas Police Department since

2017 and when the time the action accrued. Defendants John Doe Police Officers 1–50 are police

officers for the Dallas Police Department.

13.    Furthermore, the Court has specific personal jurisdiction over Defendants the

City of Dallas, Reneé Hall, and John Doe Police Officers 1-50 because Plaintiff's claims against

them arise out of or relate to a contact between them and the State of Texas. John Does 1-50

used excessive force against Plaintiff during protests in Dallas, Texas, acting on orders and

policies promulgated by Chief Hall and City of Dallas policymakers. Plaintiff claims against these Defendants arise from that occurrence and Defendants' contact in the state of Texas.

## IV.  VENUE

14.  Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

15.  Venue in the Northern District of Texas-Dallas Division is proper pursuant to 28 U.S.C. § 1391 and 28 USC § 1367 as the incidents that gave rise to this Complaint occurred in Dallas, Texas, within the Northern District of Texas, and all Defendants reside within this district.

## V.  CONDITIONS PRECEDENT

16.  Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

17.  All conditions precedent have occurred or have been performed. Fed. R. Civ. P. 9(c).

## VI.  STATEMENT OF FACTS

**A.  George Floyd's senseless death at the hands of a Minneapolis police officer again ignites nationwide protests against police brutality.**

18.  Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs.

19.  On Monday, May 25, 2020, a Black man named George Floyd was murdered by an officer of the Minneapolis Police Department. The events of Mr. Floyd's arrest and murder were captured on video by multiple bystanders as well as individual officers' body cameras. The videos depicted Mr. Floyd pinned on the street, face down and increasingly unresponsive, while Minneapolis police officer Derek Chauvin knelt on Mr. Floyd's upper back and neck, two officers

held him down, and another stood by. All four officers were fired by the Minneapolis PD, and nationwide protests have erupted in response to this police brutality. After days of continual protesting, Chauvin was charged with third degree murder. The other three Minneapolis police officers were then charged with aiding and abetting Mr. Floyd's murder, and Chauvin's charge was upgraded to second degree murder after an independent autopsy report confirmed that Chauvin was the cause of Mr. Floyd's death.

20. Undeterred by the fact that police excessive force is the very subject of these nationwide demonstrations, videos, photos, and reports of police brutality on massive scales at these protests have arisen in the past two weeks. Here in Dallas, City of Dallas Police Department officers have repeatedly used extreme and lethal force against these crowds over the past eleven days, targeting peaceful, non-threatening protesters with tear gas, smoke bombs, flash-bangs, Pepper Balls, mace, and ammunition that are known as "kinetic impact projectiles," or "KIPs." And even amid a pandemic respiratory disease, police have tear-gassed and smoke-bombed protesters, many of whom may have already been infected with Covid-19, making them more likely to suffer simply because they exercised their First Amendment rights.



*Photo, Richard Grant, depicting police officers aiming a riot-control device towards protesters in Long Beach, California.*[1]

21.     Kinetic impact projectiles, which include so-called "rubber bullets" or "sponge bullets," are often used by American police forces to control crowds. The manufacturers, distributors, and sellers of these projectiles—and the police departments that use them against their own citizens—praise these bullets as being "nonlethal" or "less lethal." They are not.  In fact, the fatality, morbidity, and significant risks of injuries from KIPs have been well documented. Regardless, in cities across the country, including Dallas, police departments have

---

[1] Richard Grant, @RichardGrant88, Twitter (June 1, 2020, 1:28 p.m.), https://twitter.com/richardgrant88/status/1267523353289474048?s=20.

attempted to quell participation in the 2020 Protests by firing KIPs into crowds, even though five decades of evidence shows such weapons can disable, disfigure, and even kill.[2]

22.      For instance, free-lance photographer Linda Tirado was shot in the eye with a "rubber bullet" in Minneapolis. "I was aiming my next shot, put my camera down for a second, and then my face exploded," Tirado told *The New York Times* after she was released from the hospital. "I immediately felt blood and was screaming, 'I'm press! I'm press!'"[3] Tirado, a career photojournalist, is now permanently blinded in one eye.[4]



*Photo, Linda Tirado, depicting Ms. Tirado's injuries in Minneapolis (May 30, 2020).*[5]

---

[2] Liz Szabo, *Police using rubber bullets on protestors that can blind, maim or kill*, CNN.COM (June 3, 2020 at 3:54 a.m.), https://www.cnn.com/2020/06/03/health/rubber-bullet-effects-kaiser-partner/index.html; Rohini J. Haar, Vincent Iacopino, Nikhil Ranadive, Madhavi Dandu, Sheri D. Weiser, Abstract: *Death, Injury and Disability from Kinetic Impact Projectiles in Crowd-Control Settings: a Systematic Review* (Dec. 5, 2017), https://bmjopen.bmj.com/content/7/12/e018154.
[3] Frances Robles, *A Reporter's Cry on Live TV: 'I'm Getting Shot! I'm Getting Shot!'*, NEW YORK TIMES.COM (May 30, 2020, last updated June 4, 2020), https://www.nytimes.com/2020/05/30/us/minneapolis-protests-press.html.
[4] Linda Tirado, *Police Blinded Me in One Eye. I Can Still See Why My Country's on Fire*, THE NEW REPUBLIC (June 4, 2020), https://newrepublic.com/article/158001/police-blinded-one-eye-can-still-see-countrys-fire.
[5] *See* Linda Tirado, @killermartinis, Twitter (May 30, 2020, 1:32 a.m.), https://twitter.com/KillerMartinis/status/1266618525600399361?s=20.

23.     In Louisville, Kentucky, a television reporter was hit by a pepper ball on live

television by an officer who appeared to be aiming at her, causing her to exclaim on the air: "I'm

getting shot! I'm getting shot!"[6] A protesting grandmother who was struck with a rubber bullet

between her eyes in La Mesa, California, landed in the intensive care unit.[7] And in Los Angeles,

police shot Marine Corps veteran C.J. Montano in the head with "rubber bullets," despite him

having his hands in the air.[8] In an interview from his hospital bed, Montano confirmed that the

ammunition has caused brain bleeding.[9]

24.     In the days since Mr. Floyd's death, federal courts in several cities, including

Portland, and Denver[10] have begun issuing injunctive relief to prohibit police forces from using

so-called "less lethal" crowd control tactics on peaceful protesters, such as rubber bullets and

tear gas.

**B.      Dallas Police have responded to current protests with unjustified violence, turning
          peaceful First Amendment protests into massive, dangerous conflicts with civilians.**

25.     The first Dallas protest in the aftermath of Mr. Floyd's death was on May 29,

2020. On that day and every day since, peaceful protestors have gathered in downtown Dallas to

demonstrate against police brutality and racial inequality. Although a small minority of

individuals present at the scene of the first weekend of protests engaged in destructive activity,

---

[6] Frances Robles, *supra* n. 3.

[7] Niala Charles, *Grandmother Hit in Head With LMPD 'Less Lethal' Projectile Remains in ICU*, NBC SAN DIEGO.COM
(May 31, 2020, last updated June 4, 2020, 11:40 a.m.), https://www.nbcsandiego.com/news/local/grandmother-
hit-with-rubber-bullet-remains-in-icu/2337061/?amp&__twitter_impression=true.

[8] *See* @LowkeySinistra, TWITTER (May 31, 2020, 10:03 a.m.),
https://twitter.com/LowkeySinistra/status/1267109420955086848.

[9] *See* video of C.J.'s Montano's interview with ABC7, @LowkeySinistra, TWITTER (June 2, 2020),
https://twitter.com/i/status/1268022557061480449.

[10] *See* Alta Spells and Madeline Holcombe, *Temporary restraining order prohibits Denver Police from using chemical
agents or projectiles against peaceful protesters without supervisor approval*, CNN.com (June 6, 2020 at 5:37 a.m.),
https://www.cnn.com/2020/06/06/us/denver-police-restraining-order-protesters-chemicals-
projectiles/index.html; Nicole Chavez, *Portland is the latest city to suspend the use of tear gas on protesters*, CNN.com
(June 6, 2020 at 9:18 p.m.), https://www.cnn.com/2020/06/06/us/portland-police-tear-gas-protests/index.html.

including property destruction, those individuals' behavior is profoundly overshadowed by the thousands of otherwise non-violent, non-threatening demonstrators who have been peaceably exercising their First Amendment rights. Nonetheless, since the first of the protests, the Dallas Police Department and other law enforcement departments, at the DPD's and Chief Hall's invitation, have directed extreme riot control tactics towards entire groups of protesters posing no harm to officers or anyone. Dressed in riot gear and driving armored vehicles, Dallas Police—like police in other cities recently—are deploying riot control devices against ordinary citizens and journalists alike, without regard to whether the circumstances justify it, and without regard or competence for shooting this "less lethal" weaponry safely.



*Photo, Central Track, depicting protesters marching through Downtown Dallas on June 6, 2020.[11]*

26.     Within the past seven days of demonstrations in Dallas triggered by the murder of George Floyd, Dallas Police officers have repeatedly used extreme and lethal force against

---

[11] Central Track, @central_track, TWITTER (June 6, 2020, 6:53 p.m.), https://twitter.com/Central_Track/status/1269417106203951104?s=20.

crowds, directly targeting peaceful, non-threatening protestors with KIPs, tear gas, smoke bombs, and other riot control devices that the City and Chief Hall praise as "less lethal."[12] In particular, Dallas Police have used a type of KIPs called 40mm eXact iMpact extended range "sponge" bullets—often referred to as "rubber bullets"—against protestors, bystanders, and journalists in order to suppress their First Amendment rights, without regard to the constitutional limits on the use of force:



*Photo, Shane McCormick, depicting sponge/rubber bullet that struck Shane McCormick and tear gas canister fired nearby at protests in Dallas, Texas on May 30, 2020.*

27.     Most upsettingly, Dallas Police have used these weapons to assert and show their dominance over protesters and the citizens of Dallas seeking to exercise their First Amendment rights and the journalists and photojournalists who are covering these events. Chief Hall has even defended her decision to shoot protesters with tear gas—a chemical weapon banned in war[13] but

---

[12] Lauren Silverman, *Dallas Police To Try 'Sponge Guns' To Help Avoid Deadly Shootings*, KERA News.org (Apr. 28, 2016), https://www.keranews.org/post/dallas-police-try-sponge-guns-help-avoid-deadly-shootings.
[13] Matt Field, *Why is tear gas banned in war but not from peaceful protests?*, BULLETIN OF THE ATOMIC SCIENTISTS (June 4, 2020),  https://thebulletin.org/2020/06/why-is-tear-gas-banned-in-war-but-not-from-peaceful-protests/.

nonetheless used against peaceful American civilians by their own governments and in their own cities—during the 2020 Protests in Dallas. Hundreds of reports of peaceful protesters, journalists covering protests, and bystanders bleeding and suffering from unwarranted levels of police force threaten to chill participation in ongoing demonstrations in Dallas. Not even the fact that protesters may unknowingly be infected with the pandemic respiratory disease Covid-19 has deterred police from tear gassing and smoke bombing protesters, making it very possible that many people exercising their First Amendment rights could suffer more severe Covid-19 symptoms aggravated by tear gas and smoke bombs if they become infected or were asymptomatic to the disease at the time.[14]

      28.     Countless non-threatening people present at the first weekend of 2020 Protests in Dallas suffered and continue suffer from injuries at the hands of police brutality. On or about May 31, 2020, Plaintiff Shenita Cleveland, a prominent community civic leader and also a former Candidate for U.S. Congress to represent the very community in which this incident took place, went to downtown Dallas to peacefully participate in a walk to show her support for the family of George Floyd.[15] When she arrived in the 400 block of Harwood Street, Dallas, Texas, Ms. Cleveland allege the event was entirely peaceful, with approximately 100 to 200 people kneeling, chanting together and others were walking about the areas. Suddenly, officers appeared and asked Plaintiff and others to "stop, get on the ground, and don't run." Almost simultaneously, Defendant officers began shooting rubber bullets at Plaintiff and others. Plaintiff was shot by Defendants at least four times. Plaintiff was shot in the toe, ankle, and both thighs with projectiles from Defendants' gun. After being shot, plaintiff was forced to the ground and told that she was being arrested for breaking the curfew. Plaintiff was handcuffed at approximately 7:40 p.m. and remained handcuffed until 1:55 a.m. the following morning—handcuffed for over

six hours.

29.      Once Plaintiff arrived at Dallas Police Department Headquarters Transfer Center, she was informed by Dallas Police that she would be ticketed and released back to her vehicle. Plaintiff was coerced into signing paperwork which indicated that Plaintiff would be charged with a curfew violation which would constitute a Class C Misdemeanor.  Later, Plaintiff was informed that the charges were changed to Violation of State of Emergency which would constitute a Class B Misdemeanor.

30.      Eventually, Plaintiff and others arrested were transported to the Dallas County, Lew Sterrett, Detention Center ("Dallas Jail"). Upon arrival at the Dallas Jail, Plaintiff was asked a few questions regarding COVID-19, given a mask, temperature taken, and placed in a holding cell—still handcuffed from the previous night.  Again, Plaintiff was not uncuffed until she was taken upstairs and booked in—approximately 1:55 a.m. on June 1, 2020.

---

[14] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On—Especially During the Coronavirus Pandemic*, PROPUBLICA.ORG (June 4, 2020, 12:25 p.m.), https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic.



31.



*Photos of Plaintiff Shenita Cleveland's injuries*[15.1,15.2]

---

15.1, 15.2 Shenita Cleveland Photo (June 2, 2002, 6:01 p.m.)

16.1  16.2

32.

*Photos of Plaintiff Shenita Cleveland's injuries*[16]

_____

[16.1,16.2] Shenita Cleveland Photo (June 2, 2002, 6:01 p.m.)

33.     The KIP left Ms. Cleveland with a broken toe, damaged ankle, and permanent injury to both thighs all which will likely require her to undergo continuous medical care now and likely in the future. The brutality against Ms. Cleveland has caused her immense physical, emotional, and mental pain, has disfigured her leg, and left her physically impaired and unable to work—problems that will continue as she faces ongoing medical treatment, currently and in the future. Ms. Cleveland remains a dedicated community activist through the fear, anxiety and emotional distress caused by Defendants remains dedicated to observing and recording the ongoing protests in a peaceful exercise of her First Amendment rights. If Ms. Cleveland is physically able, she says she would return to the 2020 Protests in Dallas if she knew that Dallas Police were prohibited from using the KIPs and other riot control devices and techniques against non-threatening protestors or in a manner that threatens her constitutional rights.

34.     The same day—May 30, 2020—a 26-year-old Black man named Brandon Saenz was walking from the dog park near Dallas' main library to looking for his friend, when he was shot in the eye with a sponge or rubber bullet by the Dallas Police. Since being shot by DPD just over a week ago, Mr. Saenz, like Mr. Doyle, has already had several surgeries to his head and face to repair the damage caused by the bullet. And tragically, Mr. Saenz has permanently lost his left

eye as a result of the shooting. Doctors implanted metal plates in his face, screws in his nose, and a drain tube in his head to prevent blood clotting. Mr. Saenz will need additional medical treatment if he is ever to fully recover from his catastrophic injuries.[17]



*Photo still of Brandon Saenz's injuries taken from WFAA.com video (June 3, 2020, 6:19 p.m.).[18]*

35.     Then on Monday, June 1, Dallas Police detained approximately 674 protesters on the Margaret Hunt Hill Bridge (the "Bridge") at the end of a march from the Frank Crowley Courts Building downtown that was, by all accounts, entirely peaceful. Video footage taken by march participants and journalists confirms: the *only* violence on the bridge came from Dallas Police officers who fired so-called "less lethal" rubber bullets at nonthreatening, kneeling

---

[17] *Dallas Protester Undergoes Multiple Surgeries After Being Shot With Rubber Bullet*, DALLAS POLICE, NBCDFW.COM (June 4, 2020, 6:42 p.m.), https://www.nbcdfw.com/news/local/dallas-protester-undergoes-multiple-surgeries-after-being-shot-with-rubber-bullet/2382882/.
[18] Kevin Reece, *Man who lost an eye to a projectile during Dallas protests demands answers from police*, WFAA.COM (June 3, 2020, 6:19 p.m.), https://www.wfaa.com/article/news/local/man-who-lost-an-eye-to-a-projectile-during-dallas-protests-demands-answers-from-police/287-8b8c4ca8-84bc-4afa-bfcd-a8fcd926c260.

PLAINTIFFS' ORIGINAL COMPLAINT & JURY DEMAND                                                                17

demonstrators, along with smoke bombs and tear gas.[19] Assessing the incident the next day, Chief Hall said, "I strongly believe we made the right decisions to deter and disperse the large crowd on the bridge."[20]

36.     But the Dallas Police did *not* "deter" or "disperse" the crowd and instead *prevented* participants from leaving by blockading them onto the bridge, a technique called "kettling."[21] When the crowd's march from downtown reached the intersection with the roadway leading to the bridge, demonstrators found the westbound ramp onto the bridge was not blocked by police, unlike other sides of the intersection. Protesters and journalists on the scene say they were told by officers to "continue moving" but were never warned not to walk up the ramp.[22] Once the last of the marchers were on the bridge, police in riot gear and armored vehicles enclosed protesters on both ends, trapping them on the bridge over thirty feet above the ground.[23]

---

[19] *See* Matt Goodman, *The Worst City Council Meeting Dallas Has Witnessed in a Decade*, DMAGAZINE.COM (June 6, 2020 12:33 p.m.), https://www.dmagazine.com/frontburner/2020/06/the-worst-city-council-meeting-dallas-has-witnessed-in-a-decade/.
[20] *Id.*
[21] Silas Allen, *Kettling Tactic Dallas Police Used Against Protesters is Steeped in Controversy*, Dallas Observer (Jun 8, 2020, 4:00 a.m.), https://www.dallasobserver.com/news/dallas-police-protesters-kettling-margaret-hunt-hill-bridge-11916828.
[22] *Id.;* Goodman, *supra* n. 19.
[23] Tim Cato, *I was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, DMAGAZINE.COM (June 3, 2020, 3:44 pm), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.



*Photo, Dylan Hollingsworth, protesters march south from Riverfront Blvd. past police, turning westward onto Margaret Hunt Hill Bridge, (June 1, 2020)*[24]

37.     Video from the leading edge of the westward march shows that as the group approached the center of the bridge, a solid line of police clad in riot gear met them at the bridge's apex, stopping the march in its tracks.[25] Protesters could all be seen frozen with hands raised, chanting, "Hands up! Don't shoot!"

 

*Photos, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[26]

---

[24] Pete Freedman, *A Few Words on the Ambush at Large Marge*, CENTRALTRACK.COM (June 8, 2020), https://www.centraltrack.com/a-few-words-on-the-ambush-at-large-marge/.
[25] @thatgirljacqs, TWITTER (June 2, 2020), https://twitter.com/thatgirljacqs/status/1268002580602421248, :09.
[26] *See* Freedman, *supra*, note 23.

38.     As the line of police continued to advance eastward toward them, the group kneeled.[27] But police continued marching toward the kneeling protesters. Over a minute passed as police closed the gap, coming less than 20 to 30 feet from the group, even as protesters periodically stood to back up before kneeling again. Suddenly and without warning or any provocation, police launched canisters directly at protesters, which caught fire before releasing smoke or tear gas into the crowd.[28] At about the same time, tactile weapons could be heard firing, as the peaceful crowd screamed. As the crowd continued to back away from the smoke and police, the police line kept marching toward them, shooting projectiles at the retreating protesters.[29] As protesters peacefully attempted to retreat, they could be heard pleading: "This is a peaceful protest! We're peaceful!" ". . . Peaceful!!"[30]



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[31]

---

[27] @thatgirljacqs, TWITTER, *supra* note 28, at :15.
[28] *Id.* at 1:18; Tim Cato, *I Was Detained in Dallas' Bridge Raid. It Never Needed to Happen*, D Magazine (June 3, 2020, 3:44 p.m.), https://www.dmagazine.com/frontburner/2020/06/i-was-detained-in-dallas-bridge-raid-it-never-needed-to-happen/.
[29] @thatgirljacqs, TWITTER, *supra* note 28, at 122–1:57.
[30] *Id.* at 1:58–2:09.
[31] *See* Freedman, *supra*, note 26.



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[32]

39.    Having "seen nonviolent protesters in virtually every state get gassed, shot at, beaten, and arrested over the weekend," the members of the march knew not to resist the police in any way: "Instead, we knelt. We put our hands up. I think we started chanting, 'Don't shoot.' Local reporters attest we had not committed a single act of violence or destruction the entire night. Moments later, they opened fire on us."[33]  Protestors say that, despite Chief Hall's claim that police warned protestors that marching onto the bridge would lead to arrest, they never heard that warning.[34]  Additionally, to the extent that police officers are sometimes required to make "split second decisions," no such quick or life-threatening decisions were required on the Bridge that night. Indeed, the Dallas Police officers engaged in a protracted, slow, and

---

[32] *See* Freedman, *supra*, note 23.
[33] *See* Cato, *supra*, note 22.
[34] *Id.*

coordinated march towards the peaceful protesters, who never acted threateningly or

aggressively in any way.



*Photo, Dylan Hollingsworth, Margaret Hunt Hill Bridge, (June 1, 2020).*[35]

    40.

---

[35] *See* Freedman, *supra*, note 23.

41.     These stories are only some of those that continue to emerge from the 2020

Protests in Dallas. Countless other people have been injured by recent police brutality in Dallas,

including one woman not affiliated with protests who was walking out of Whole Foods after

grocery shopping when police shot her in the face with a projectile.[36]



*Photo, Kevin Krause, of woman injured by projectile in Dallas (May 30, 2020)*[37]

42.     The conduct of the Dallas Police, particularly toward peaceful protestors, shows

that Dallas Police are present at protests not simply to prevent property damage and keep the

public safe but rather to counter the police brutality protests. Indeed, Dallas Police are dressed

and armed to use violence. It is evident through its militaristic, indiscriminately violent conduct

---

[36] *See* Dallas Morning News reporter Kevin Krause, @KevinRKrause, TWITTER (May 30, 2020, 8:04 p.m.), https://twitter.com/KevinRKrause/status/1266898396339675137/.
[37] *Id.*

toward peaceful protesters, bystanders, press—and as widely captured on video—that the Dallas Police were not there to serve a public safety role, but instead to dominate the protesters.

43.     Against this backdrop, immediate federal intervention is necessary to enjoin the unconstitutional use of excessive force to disperse and suppress peaceful protests.

**C.    The "rubber" or "sponge" bullets Dallas Police are using can be deadly.**

44.     "Rubber bullets are bullets. Bullets can kill."[38] KIPs—often called "rubber," "sponge," or "foam" bullets—describe a category of ammunition used commonly in crowd-control settings, including Pepper Balls. Some KIPs are made of hardened foam or plastic, often containing a rigid or metal core. Others are "beanbag" type rounds, and others may be composed of rubber or wood.



*Graphic created for Fowers, Steckelberg & Berkowitz, WashingtonPost.com (June 5, 2020).*[39]

---

[38] Brian Resnick, *Rubber bullets can seriously mess you up: The dangers of "nonlethal" police weapons—like rubber bullets, flash-bang grenades, and tear gas—explained*, Vox.com (June 4, 2020, 9:21 a.m.), https://www.vox.com/identities/2020/6/3/21279047/rubber-bullets-flash-bang-tear-gas-police-protests; Amanda Arnold, *"Rubber Bullets" Are Not Rubber*, The Cut.com (June 5, 2020), https://twitter.com/mcgrudis/status/1268591923402436609/photo/1.

[39] Alyssa Fowers, Aaron Steckelberg, & Bonnie Berkowitz , *A guide to the less-lethal weapons that law enforcement uses against protesters*, Washington Post.com (June 5, 2020), https://www.washingtonpost.com/nation/2020/06/05/less-lethal-weapons-protests/?arc404=true.

45.     "Regardless of their composition, these projectiles are shot out of guns at speeds comparable to that of a typical bullet, and when they hit their target, they can maim, blind, or even kill."[40] Although police departments like Dallas often use KIPs in crowd control because they are allegedly "nonlethal" or "less lethal," research shows they cannot be used safely. At close range, they "can break bones. They can facture skulls. If they hit the face, they can cause permanent damage and disability."[41] And even at long distances, they "have unpredicted trajectories, they bounce, and they're quite indiscriminate."[42] In fact, some police departments prohibit KIP usage within 165 feet:



*Graphic created for Fowers, Steckelberg & Berkowitz, WashingtonPost.com (June 5, 2020).*[43]

46.     An independent 2017 study found that these projectiles have caused significant morbidity and mortality during the past 27 years, much of it from penetrative injuries and head, neck and torso trauma.[44] Given their inherent inaccuracy, potential for misuse and associated health consequences of severe injury, disability and death, KIPs do not appear to be appropriate

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *See* Fowers, Steckelberg & Berkowitz, *supra*, note 39.
[44] Haar RJ, Iacopino V, Ranadive N, et al. *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* BMJ OPEN (2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/.

weapons for use in crowd-control settings. There is an urgent need to establish international guidelines on the use of crowd-control weapons to prevent unnecessary injuries and deaths.

47.      The findings of the 2017 BMJ study indicate that KIPs have caused serious injury, disability and death. In the 26 studies selected for analysis, researchers identified 1,984 people with injuries, 53 of whom died as a result of their injuries. Among those injured, fifteen percent of the injuries resulted in permanent disability; 3 percent resulted in death.[45] Injuries were to the eyes overwhelmingly (84.2 percent) resulted in blindness. Permanent disabilities and severe injuries often resulted from strikes to the head and neck (48 of deaths and 87% of permanent disabilities). These findings indicate that these "less lethal" weapons still readily cause severe injuries and death.

48.      Accordingly, organizations like Physicians for Human Rights have concluded "KIPs in general are not an appropriate weapon for crowd managements and, specifically, for dispersal purposes. Most cannot be used effectively and safely against crowds. At close ranges, levels of lethality and patterns of injury of some KIPS become similar to those of live ammunition. At longer ranges, KIPs are inaccurate and indiscriminate. Some KIPs are lethal in close range and ineffective at longer distances which make safe use difficult."[46]

49.      That is why law enforcement experts are warning that "[r]ubber bullets should be used only to control "an extremely dangerous crowd," said Brian Higgins, the former police chief of Bergen County, New Jersey.[47] "Shooting them into open crowds is reckless and

---

[45] *See* Resnick, *supra*, note 37.

[46] Physicians for Human Rights, Kinetic Impact Projectiles Factsheet (2016) (citing PHYSICIANS FOR HUMAN RIGHTS & INCLO, *Lethal in Disguise: The Health Consequences of Crowd-Control Weapons* (March 2016)).

[47] Liz Szabo, *Rubber bullets can kill, blind or maim people for life, but authorities continue to use them*, USATODAY.COM (June 3, 2020, 12:04 p.m.), https://www.usatoday.com/story/news/health/2020/06/03/rubber-bullets-less-lethal-weapons-can-kill-but-still-used/3134019001/.

dangerous," said Dr. Douglas Lazzaro, a professor and expert in eye trauma at NYU Langone Health.

50.     Now lawmakers in Texas and nationwide are calling for a ban on this "less lethal ammunition." Texas State Representative Erin Zwiener said: "We have people in critical condition at the hospital....... Even if these aren't as life-ending as often, they're certainly life-altering. And I'm not seeing these weapons used with the judiciousness and respect for life that a weapon of the kind requires."[48]

**D.     The City's actual policy is to use KIPs and other "less lethal" force in a deadly manner, as long as officers feel it is necessary to disperse protesters—even if it violates the City's own written polices and the Constitution.**

51.     In response to a Public Information Act request for purchase orders of "rubber bullets," the Dallas Police Department produced a purchase order for these 40mm eXact iMpact extended range "sponge" bullets. This further indicates that the Dallas PD refers to "sponge" bullets as "rubber" bullets.

52.     Incredibly, the City of Dallas has no apparent written policy whatsoever on the use of these sponge bullet KIPs, even though the Dallas PD has been purchasing them since at least 2013. And officers have shown time and time again that they have never been properly trained—if at all—on when and how the use of these weapons is permitted by the United States Constitution. Yet police in Dallas continue to use these extreme, deadly weapons against passive protestors never posing the immediate risk of serious harm the Constitution requires before officers may consider using deadly force.

---

[48] Nic Garcia, *Texas police deployed less-lethal ammunition to control protests. Now policymakers want to ban the weapons*, DALLASNEWS.COM (June 9, 2020 11:13am), https://www.dallasnews.com/news/2020/06/09/texas-police-deployed-less-lethal-ammunition-to-control-protests-now-policymakers-want-to-ban-the-weapons/.

53.     This week's egregious abuses are by no means the first time the City of Dallas and
Chief Hall have discovered—and then ratified—officers' use of "less lethal" ammunition against
peaceful protesters. After Dallas Police used Pepper Balls on a non-threatening crowd in the
September 2018 protests following Botham Jean's murder by officer Amber Guyger, it became
evident that the City knew its officers violated written policies on the use of "less lethal" force
and were untrained in the proper use of those weapons for crowd control.

54.     Like recent events, none of the Botham Jean-related protestors were threatening
any physical violence or property damage when they were shot with Pepper Balls—a direct
violation of the DPD's General Orders prohibiting officers from using Pepper Balls unless the
crowd was "threatening unlawful property damage or physical force." Indeed, Chief Hall
admitted that she was concerned when she learned police fired the ammunition with no
"immediate threat to the public" to justify their use under the General Orders. "The day after
the protest, one of many after Jean's Sept. 6 death, Police Chief U. Renee Hall called for a review
of the pepper-ball incident."[49] In a written statement, Chief Hall admitted she had knowledge of
the excessive force: "I am concerned to learn of reports that one of our officers deployed
potentially several pepper balls during a demonstration last night. I have asked our investigative
unit to conduct a full review. The use of pepper balls is governed by our General Orders, and they
are only to be utilized if instructed to do so by the on-scene commander or if there is an

---

[49] Cassandra Jaramillo, *Dallas officer's pepper-ball use during Botham Jean protest deemed 'consistent' with policy*,
DALLASNEWS.COM (Dec 28, 2018 6:00 a.m.), https://www.dallasnews.com/news/2018/12/28/dallas-officers-
pepper-ball-use-during-botham-jean-protest-deemed-consistent-with-policy/.

immediate threat to the public. I plan to meet directly with the leadership of the demonstration to address their concerns."[50]

55.      But Chief Hall took no action against the officers and instead reinforced the practice, directly resulting in the physical injuries and deprivations of protestors' constitutional rights to under the First and Fourth Amendments protestors continue to face in current ongoing protests.[51]

56.      In fact, the General Orders governing the use of Pepper Balls at the time stated that Pepper Balls "[m]ay be used as saturation to disperse unruly or rioting crowds threatening unlawful property damage or physical force." The orders further state that "[t]he Pepper Ball System Area Saturation will not be used on subjects who are passively resisting or who are not posing a physical threat to persons/property to include persons fleeing the scene."

57.      None of the officers involved or Chief Hall ever suggested the protesters were threatening unlawful property damage or physical force, or that they ever did more than passively resist, as the policy required. The only stated reason for shooting Pepper Balls at the crowd was "to keep protesters back" as the crowd turned onto Cadiz Street headed for the Dallas Police Association office.[52]

58.      Nevertheless, the preliminary report of the incident review concluded that the use of the Pepper Ball gun "was 'consistent' with the department's general orders."[53]  The report also found that the officer seen on video firing the ammunition was not certified to use the gun at

---

[50] Mo Barnes, *Dallas PD's violent response to peaceful protests in Botham Jean shooting* (Sept. 12, 2018), https://rollingout.com/2018/09/12/dallas-pds-violent-response-to-peaceful-protests-in-botham-jean-shooting/.
[51] Cassandra Jaramillo, *Chief orders review after Dallas cop caught on video shooting pepper balls at Botham Jean protest*, DALLASNEWS.COM (Sept. 11, 2018, 3:00 p.m.), https://www.dallasnews.com/news/crime/2018/09/11/chief-orders-review-after-dallas-cop-caught-on-video-shooting-pepper-balls-at-botham-jean-protest/#.
[52] Jaramillo (Dec. 28, 2018), *supra,* note 48.
[53] *Id.*

the time, and that his "certification on the gun had been expired for a year."[54] And, although Hall did not know the day after the incident whether the officer was instructed to use the weapon by the on-scene commander, the report found that a sergeant had instructed officers "to deny the crowd access to Cadiz Street."[55] Ultimately, "the incident was treated as minor by the department."[56]

59.     By approving of the use of Pepper Balls against a crowd that did no more than passively resist—let alone threaten to damage any property or use physical force—the City ratified the use of "less lethal" ammunition that directly violated the General Orders. The Jean incident showed not only that officers not qualified to use less lethal ammunition are instructed to do so anyway, but that even when that unqualified officer predictably uses the weapon in a way that plainly violates written City policy, City officials simply deny that the policy says what it says. And, even though the Jean incident made it plain that officers were in need of training to use these "less lethal" guns for crowd control only in way actually "consistent" with the City's policies, the City has never given officers training on the matter. Regardless of what the City's written policy says, therefore, the City's *de facto* policy allows police to use "less lethal" ammunition against a crowd of non-threatening protestors.

60.     Despite knowing that officers were not trained to follow the City's written policies on the Pepper Ball System, and having ratified the custom of using such extreme force against non-threatening protestors as official policy, the City of Dallas still chose to purchase and arm officers with another form of "less lethal" ammunition without enacting any general order to

---

[54] *Id.*
[55] *Id.*
[56] *Id.*

ensure the constitutional use of the weapon, or even provide officers any training in how to do so. The City of Dallas has an established pattern and practice of using excessive, potentially lethal force to disperse non-violent peaceful protestors in Dallas.

61.     The City and Chief Hall knew from the Jean protests that officers were not trained on the proper use of "less lethal" PepperBall KIPs for crowd control when the City contracted to use "sponge rounds." But instead of training officers accordingly, the City added another "less lethal" KIP to officers' arsenal. Even though the "sponge" bullets are even more harmful than PepperBalls, the City ignored the increased danger they pose citizens by providing officers no additional training on how to use the sponge bullets. And never since 2013, when the City purchased the sponge bullets, has the City or Chief Hall established a general order or written policy specific to the more dangerous weapon.

62.     The City can hardly be surprised that when groups gathered again in Dallas to protest yet another police killing of a non-resisting, unarmed black civilian, George Floyd, Dallas police officers would again use "less lethal" munitions to control the crowd—ignoring, as it had before, whether the crowd posed any threat of harm, let alone an immediate threat of serious harm to persons. When Dallas Police used these projectiles against Ms. Cleveland and others on May 31, 2020 and when Dallas Police trapped other protestors and the hundreds of protesters on the Bridge on June 1, the crowd police fired directly into—like crowd in the Jean incident—did not riot and never threatened property damage or physical force, as journalists on the scene and video footage of the events confirm.

63.     This time, however, the weapons Dallas Police are using to control the non-threatening crowd of protestors are more lethal than claimed. And this time, protestors not only knelt and raised their hands, they were retreating. Some protesters even turned their backs and

began running away from the advancing officers. Still, police stalked protesters down throughout downtown and again shot KIPs directly at protesters, without provocation. Officers purported to act for the protection of its citizens did just the opposite.

64.     Again, when faced with plain instances of Dallas Police violating the constitutional limits of force and the City's own written policies, the City and Chief Hall have encouraged and defended the practice, deterring protesters from attending future protests. In doing so, the City and Chief Hall reaffirmed the City's official unwritten policy and practice of using excessive, potentially deadly, force against non-threatening, peaceful protesters as a means of intimidation and control.

65.     Predictably, peaceful protestors, journalists, and bystanders have suffered serious injuries from the use of "less lethal" KIPs, tear gas, smoke bombs, and other riot control devices designed to quell their exercise of First Amendment rights.

**E.      Under pressure from continual public outcry amid the ongoing 2020 Protests in Dallas and nationwide, officials refuse to acknowledge failures.**

66.     Chief Hall recently confirmed what so many citizens and plaintiffs have known: The City's current use of force policies are insufficient to "address challenges between law enforcement and communities of color."[57] Public outrage over the June 1 Bridge incident has

---

[57] *Dallas Police Chief Renee Hall Lays Out Plan to Build Trust, Address Use of Force and Racial Bias*, WBAP.COM (June 8, 2020), https://www.wbap.com/2020/06/08/dallas-police-chief-renee-hall-lays-out-plan-to-build-trust-address-use-of-force-and-racial-bias/.

prompted Dallas residents to demand Chief Hall's resignation.[58] As Chief Hall explained, when Mayor Eric Johnson asked her "Where would you say the buck stops in the Dallas Police Department?" Hall replied: "It stops with me."[59] Chief Hall has not recanted her statement defending officers' actions at the Bridge under the guise of "protect[ing] protesters from vehicular injury on a roadway still open to traffic."[60] Tellingly, after arresting protestors on the Bridge (purportedly for obstructing a highway or for violating the curfew ordinance; protesters were not clear why they were being arrested), Chief Hall dropped charges—but only ***after*** demonstrators were successfully intimidated and deterred from exercising their First Amendment rights.

67.     In what has been called "the worst city council meeting Dallas has witnessed in a decade," Dallas Mayor Eric Johnson grilled Chief Hall about the incident on the bridge and challenging her claim that officers did not tear gas in question.[61] "Hall said tear gas was not fired, that it was smoke. She said she ordered the SWAT team to not fire tear gas. Mayor Johnson then wanted to know the chemical breakdown in the smoke. She could not say. Councilman Adam Medrano said he believed the chief's order to not fire tear gas was disobeyed, because the

---

[58] Hady Mawajdeh, P*ublic Anger At Dallas Meeting Focuses On Police Tactics At Margaret Hunt Hill Bridge Protest*, KERANEWS.ORG (June 7, 2020), https://www.keranews.org/post/public-anger-dallas-meeting-focuses-police-tactics-margaret-hunt-hill-bridge-protest?fbclid=IwAR0w_cAsern_R59r0bYtehSXJUF-mN9vJv8ry1cqQBecMrEyR1pU1UCfABc.

[59] Demond Fernandez, *Dallas City Council convenes in special meeting to discuss response to protests*, DALLAS BUSINESS JOURNAL & WFAA (June 6, 2020), *available at* https://www.bizjournals.com/dallas/news/2020/06/06/dallas-city-council-protests.html.

[60] Cassandra Jaramillo & Hayat Norimine, *Dallas Police Chief Reneé Hall says protesters who marched on Margaret Hunt Hill Bridge will not be charged*, DALLASNEWS.COM (June 4, 2020, at 7:11 p.m.), https://www.dallasnews.com/news/courts/2020/06/04/dallas-police-chief-renee-hall-says-protesters-who-marched-on-margaret-hunt-hill-bridge-will-not-be-charged/

[61] Matt Goodman, *The Worst City Council Meeting Dallas Has Witnessed in a Decade*, DMAGAZINE.COM (June 6, 2020 12:33 p.m.), https://www.dmagazine.com/frontburner/2020/06/the-worst-city-council-meeting-dallas-has-witnessed-in-a-decade/.

reactions of those on the bridge was so violent. He demanded that she determine who violated her order."[62]

68.     Across America, cities are announcing plans to consider significant changes in police protocol and, indeed, whether to limit the extent and funding of police departments as a whole. Indeed, city councils and mayors of major cities like Minneapolis, Los Angeles, and New York City have committed to reducing—or even defunding entirely—their police departments.[63] "A growing number of people suffering serious injuries in Dallas, Austin and across the nation from plastic, rubber and wooden bullets are raising new questions about how and when police officers use these weapon."[64] Then on June 9, Austin's police chief "banned the use of these weapons for crowd control purposes after a 20-year-old black man, a Latino teenager and a pregnant woman were critically injured."[65]

69.     Under this constant pressure, Chief Hall announced on Thursday, June 4, 2020, that Chief Hall "had instituted a new general order compelling members of the department — both sworn and non-sworn—'to either stop, or attempt to stop, another employee when force is being inappropriately applied or is no longer required.'"[66] Then on Monday, June 8, Chief Hall officially banned chokeholds and "said next week the Dallas Police Department will institute a

---

[62] *Id.*
[63] Danielle Wallace, *These cities have begun defunding police in the wake of George Floyd protests*, FOXNEWS.COM (June 8, 2020), https://www.foxnews.com/us/defund-police-george-floyd-protest-reforms-new-york-los-angeles-minneapolis.
[64] Garcia, *supra*, note 46.
[65] *Id.*
[66] Hayat Norimine, *Dallas' Chief Hall implements 'duty to intervene' policy after calls for greater police accountability*, DALLASNEWS.COM (June 5, 2020 1:04 a.m.), https://www.dallasnews.com/news/crime/2020/06/05/dallas-chief-hall-implements-duty-to-intervene-policy-after-nationwide-calls-for-police-accountability/.

policy requiring officers to announce warnings before shooting."[67] Then next month, Chief Hall

says the Dallas PD will institute a policy requiring police to announce warnings before shooting,

"to release more dash cam and body cam videos as well as order a review all use of force

policies." *Id.* Yet the City and Chief Hall have announced no plans to enact policies that address

the use of KIPs and other riot control devices as "crowd control"—or to review whether they

can be used at all in a safe constitutional manner. And Chief Hall has intentionally failed to

identify the officers responsible for causing Plaintiffs' injuries.

## VII.   CAUSES OF ACTION

### Count 1: Civil Rights Claim (42 USC § 1983)
### Violation of First Amendment Rights
### Against the City of Dallas and
### John Doe Police Officers 1-50 in their individual capacities

70.     Plaintiff by reference incorporate and reallege all of the preceding paragraphs as

though fully stated herein.

71.     Plaintiff engaged in constitutionally protected acts of observing, recording, or

participating in events of public interest, including public demonstrations and in expressing their

political views. Plaintiffs will continue to do so in the future.

72.     In 2018, Chief Hall admitted that she knew "less lethal" ammunition was being

used against peaceful protestors who were not threatening to commit property damage or

physical violence but encouraged and defended the practice because it dispersed the crowds.

73.     The actions of John Doe Police officers 1-50—namely, the suppression of a

peaceful demonstration and the viewpoint it represented—and the actions of Chief Hall in

---

[67] J.D. Miles, *Dallas Police Chief Renee Hall Lays Out More Policies Addressing Use Of Force, Racial Bias*, CBSLOCAL.COM (June 8, 2020, 3:35 p.m.), https://dfw.cbslocal.com/2020/06/08/dallas-police-chief-renee-hall-policies-use-force-racial-bias/.

ordering such suppression, deprived Plaintiff of her rights under the First Amendment to the United States Constitution to freedom of speech, freedom of press, freedom of assembly, and freedom to petition the government for a redress of grievances. Defendants deliberately violated well-established limitations on the exercise of speech and assembly in public places.

74.     Defendants retaliated against Plaintiff for engaging in constitutionally protected activity and for the content and viewpoint of her expressions. Defendants' retaliation is part of a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

75.     Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest justifying the infringement of Plaintiff's First Amendment rights. Even assuming, arguendo, that there had been a compelling government interest in protecting against property damage or clearing streets of protestors, Defendants' actions toward Plaintiff and the groups of protesters were not narrowly tailored to serve that government interest in a lawful manner.

76.     Plaintiff reasonably fear the continued indiscriminate use of KIPs and deployment of chemical agents without warning. Plaintiff further reasonably fear unlawful seizure and excessive force through the firing of flash bang grenades, KIPs and other projectiles, and other means if Plaintiff and protesters continue to engage in constitutionally protected activity.

77.     These acts would chill a reasonable person from continuing to engage in a constitutionally protected activity. These acts did, in fact, chill Plaintiff from continuing to observe and record some events of public interest and to participate in peaceful protests.

Defendants acted with reckless or callous indifference to the federally protected rights of Plaintiff.

78.     It was the City of Dallas' custom and policy, as well as the City of Dallas' and Chief Hall's failure to train and supervise Dallas Police officers and issue corrective instructions after violations were brought to light, that caused the First Amendment retaliation.

79.     Defendants' continued failure to supervise and train Dallas Police officers with respect to the First Amendment rights of Plaintiffs amounts to deliberate indifference to the rights of Plaintiffs.

80.     The pattern of similar constitutional violations against Plaintiff and other protesters that occurred during the 2018 and 2020 protests demonstrates the deliberate indifference of the Defendants to the rights of Plaintiff and other protesters.

81.     Further, given the multiple constitutional violations documented above, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that Defendants demonstrated their deliberate indifference to the need for such training and supervision.

82.     Plaintiff's First Amendment rights were violated when she was deliberately targeted and shot with KIPs, tear gas, flashbang grenades, and smoke during the course of her protest activities.

83.     Plaintiff reasonably fear further retaliation in the future if they continue to observe, record, or participate in constitutionally protected activity.

84.     Defendants intentionally and with reckless disregard caused the injury of Plaintiff by means of John Does' use of physical force to suppress free speech, which was instructed

and/or authorized by Chief Hall. These actions or omissions were the direct result of the City of Dallas' written and unwritten policies.

85.    As a direct and proximate result of the acts and omissions of Defendants set forth above, Plaintiff was deprived of her First Amendment rights to freedom of speech, freedom of press, freedom of assembly, and freedom to petition the government for a redress of grievances. Plaintiff's First Amendment rights were further chilled, and Plaintiff suffered injuries and damages.

*Count 2: Civil Rights Claim (42 U.S.C. § 1983)*
*Excessive Force*
*Violation of Fourth and Fourteenth Amendment Rights*
*Against the City of Dallas and*
*John Doe Police Officers 1-50 in their individual capacities*

86.    Plaintiff incorporates by reference and reallege all of the preceding paragraphs as though fully stated herein.

87.    At all times alleged herein, Defendants John Doe Police officers 1-50 were sworn police officers with the Dallas City Police Department and acting under color of law.

88.    At all relevant times alleged herein, no citizen, officer, or bystander was in imminent fear for their life or in fear of the Plaintiff causing them serious bodily injury.

89.    At all relevant times alleged herein, Plaintiff never threatened to harm any property.

90.    At all relevant times, Plaintiff possessed the right to be free from excessive force.

91.    Chief Hall instituted a policy and practice of using excessive force against non-threatening, peaceful protesters as a means of intimidation and control.

92.    John Doe Police Officers 1-50 used objectively unreasonable force when Plaintiff did not pose an imminent threat of death or serious bodily injury to the Defendants or any other person during the relevant time alleged herein.

93.    John Doe Police Officers 1-50 further used objectively unreasonable force when Plaintiff did not pose any threat of harm to property during the relevant time alleged herein.

94.    Several officers on the bridge did not use any force at all because it was unreasonable and unjustified. This further demonstrates that Defendant John Does 1-50's use of force was objectively unreasonable.

95.    It is clearly established law that using physical force such as KIPs—including rubber, sponge, or pepper bullets—against a non-threatening individual is unreasonable and violates the Fourth Amendment right to be secure in their person. And, given the gross disparity between the need for force and the level of pain and injury inflicted, the officers' use of force was malicious and sadistic.

96.    John Doe Police Officers 1-50 did not need to fire KIPs at a non-threatening peaceful crowd. Moreover, the use of KIPs bullets was unwarranted and excessive to the articulated need of dispersing protesters from the downtown Dallas area and excessive to the purported need of effectuating arrest.

97.    Likewise, Defendants' use of force was inappropriate and unwarranted as a use of crowd control for peaceful, non-threating participants in protests, in violation of the Plaintiff's Fourteenth Amendment rights to due process.

98.    The excessive force used by John Doe Police Officers 1-50 is the direct result of the City of Dallas' *de facto* unwritten policy allows police to use "less lethal"—but not

"nonlethal"—ammunition and devices against a crowd, including against protesters who are not immediately threatening serious physical injury. The City of Dallas knew since at least the 2018 protests following Botham Jean's death of the obvious risk that KIPs would cause the type of physical and constitutional injuries that Plaintiffs have suffered. And the City of Dallas has used sponge/rubber bullet KIPs since at least 2013. Yet the City has never developed any written or unwritten policy regarding the constitutional use of the KIPs and, thus, it was highly predictable that Dallas Police officers would continue to violate protesters', bystanders', journalists', and citizens' (like Plaintiff) constitutional rights using sponge/rubber and other KIPs. Accordingly, the City of Dallas and Chief Hall have been deliberately indifferent to the complete lack of training, or completely inadequate training, they have given Dallas Police officers on these "less lethal" forms of ammunition.

99.     The written and unwritten policies of the Defendant the City of Dallas, therefore, are the moving forces behind Plaintiff's constitutional violations inflicted through the excessive force of John Doe Police Officers 1-50.

100.     As a direct and proximate cause of Defendants' use of excessive force, Plaintiff suffered and continue to suffer severe injuries including, but not limited to, emotional distress and physical pain and suffering.

### Count 3: Civil Rights Claim (42 U.S.C. § 1983)
### Unlawful Seizure
### Violation of Fourth Amendment Rights
### Against the City of Dallas
### and John Doe Police Officers 1-50 in their individual capacities

101.     Plaintiffs incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

102.     Plaintiff was seized by Defendants when Dallas Police officers willfully, through the use of force and threat of arrest, chemical agents, KIPs and other projectiles, and other riot control tactics, terminated Plaintiff's freedom of movement.

103.     Defendants committed these acts without forewarning or justification and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

104.     At all times relevant, Plaintiff did not commit a crime.

105.     At all times relevant, Plaintiff did not pose a threat to any of Defendants' officers or agents, to Plaintiff themselves, or to any other person.

106.     It was the City of Dallas' custom and policy, as well as the City of Dallas' and Chief Hall's failure to train, supervise, and discipline its officers or issue corrective instructions after violations were brought to light, that caused the unlawful seizures and excessive use of force.

107.     Plaintiff's Fourth Amendment rights were violated when she was deliberately targeted and shot with KIPs, tear gas, flashbang grenades, and pepper spray during the course of Plaintiff's lawful protests and presence at the protests. Because Dallas Police officers actively threatened Plaintiff with these "less lethal" weapons throughout their encounters with Dallas Police, Plaintiff was not free to leave without such physical force being used against her.

108.     Plaintiff reasonably fear further retaliation in the future in violation of the Fourth Amendment if she continue to observe, record, or participate in constitutionally protected activity.

PLAINTIFFS' ORIGINAL COMPLAINT & JURY DEMAND                                    41

109.     It is the pattern and practice of the City of Dallas and Chief Hall to arrest but not charge protesters as a means to suppress First Amendment rights. As explained above, it is also the City of Dallas' *de facto* unwritten policy for police to use "less lethal"—but not "nonlethal"—ammunition and devices against a crowd, including against protesters who are not immediately threatening serious physical injury.

110.     These written and unwritten policies of the Defendant the City of Dallas, therefore, are the moving forces behind Plaintiff's unconstitutional seizure in violation of her Fourth Amendment rights.

111.     As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiff was deprived of her Fourth Amendment rights and suffered injuries and damages.

*Count 4: Civil Rights Claim (42 U.S.C. § 1983)*
*Failure to Supervise & Discipline*
*Violation of Fourth and Fourteenth Amendment Rights*
*Against the City of Dallas and Chief Reneé Hall in her individual capacity*

112.     Plaintiff incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

113.     The City of Dallas and Chief Hall are directly responsible for supervising police officers in the use of physical and lethal force and for disciplining police officers for using force that violates City policies or the Unites States Constitution.

114.     The City of Dallas and Chief Hall knew at least as early as 2018 that Dallas Police officers were using KIPs like Pepper Balls as a means of crowd control for non-threatening protestors in violation of the General Orders of the Dallas Police and the United States Constitution. But the City of Dallas and Chief Hall deliberately chose not to supervise Dallas

Police officers to ensure they were only using KIPs within the constitutional limits on the use of force. The City of Dallas and Chief Hall also failed to discipline officers who used KIPs against non-threatening protesters or to discipline officers who used KIPs in a manner that violated the General Orders and the Constitution. Instead, Chief Hall further authorized the unsafe use of KIPs and authorized the further use of the ammunition to peaceful, non-threatening, protestors, as a means of crowd control and to deter the exercise of Plaintiff's First Amendment rights. This constituted deliberate indifference toward the outrageous and reckless use of force.

115.     The City of Dallas and Chief Hall also knew of the risks associated with the 40 mm eXact iMpact extended range sponge round, including certain incapacitation, or significant injury. But the City of Dallas and Chief Hall also failed to take disciplinary action in response to the unlawful use of KIPs against non-threatening crowds protesting the death of George Floyd in 2020. The City of Dallas and Chief Hall also failed to take disciplinary action in response to officers using KIPs for crowd control in an unlawful manner that was likely to cause serious injuries and, possibly, death.

116.     Although the City of Dallas has used sponge and/or rubber bullet KIPs since at least 2013 and the City issued General Orders for less lethal Pepper Ball KIPs by 2016 at the latest, the City and Chief Hall have never issued General Orders regarding sponge and/or rubber bullet KIPs. Likewise, Chief Hall and the City of Dallas ratified the use of Pepper Ball KIPs against non-threatening protestors in violation of those General Orders. Accordingly, given that Chief Hall did not discipline or supervise police officers who used sponge and/or rubber bullet KIPs against Plaintiff and other non-threatening protesters, it is reasonable to infer that in the

eyes of the City of Dallas and Chief Hall, the officers' illegal conduct actually conformed with City policy.

117.    These written and unwritten policies of the Defendant the City of Dallas in failing to supervise or discipline the Dallas Police officers are, therefore, the moving forces behind the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

118.    As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiff was deprived of her Fourth and Fourteenth Amendment rights and suffered injuries and damages.

**COUNT 5: CIVIL RIGHTS CLAIM (42 U.S.C. § 1983)**
**FAILURE TO TRAIN**
**Violation of Fourth and Fourteenth Amendment Rights**
*Against the City of Dallas and Chief Reneé Hall in her individual capacity*

119.    Plaintiff incorporate by reference and reallege all of the preceding paragraphs as though fully stated herein.

120.    The City of Dallas and Chief Hall are directly responsible for training on the use of firearms with regard to lethal and allegedly less lethal impact weapons, the manner of use, distance of use, and use of force continuum.

121.    Chief Hall had direct supervisory and policymaking responsibilities for police officers in the use of physical and lethal force.

122.    Defendant Hall knew of the risks associated with the 40 mm eXact iMpact extended range sponge round but failed to institute any training with regard to the range and risks of certain incapacitation, or significant injury.

123.    Defendant Hall and the City of Dallas knew that as of 2018, the Dallas Police Department officers were using KIPs like Pepper Balls as a means of crowd control for non-

threatening protestors in violation of the General Orders of the Dallas Police and the United States Constitution. But Chief Hall deliberately chose not to train the Dallas Police officers regarding the threat level necessary to justify using the Pepper Ball System or other KIPs against a crowd within the constitutional limits on the use of force. Instead, Chief Hall further authorized its use and authorized the further use of such ammunition toward peaceful, non-threatening protestors as a means of crowd control and to deter the exercise of Plaintiff's First Amendment rights. This constituted deliberate indifference and outrageous and reckless use of force.

124.    The City of Dallas and Chief Hall also knew of the risks associated with the 40 mm eXact iMpact extended range sponge round, including certain incapacitation, or significant injury. But the City of Dallas and Chief Hall also failed to train officers in the threat level necessary to justify using the sponge bullet KIPs against crowds within the constitutional limits on the use of force. The City of Dallas and Chief Hall also failed to train officers to use KIPs in manners unlikely to cause serious injuries and death.

125.    Even after the abuses of Pepper Ball KIPs in 2018, Chief Hall and the City of Dallas ratified the use of Pepper Ball KIPs against non-threatening protestors in violation of applicable General Orders and the Constitution. The City of Dallas and Chief Hall knew or should known that that approach has failed to prevent tortious conduct by Dallas Police officers. The City of Dallas and Chief Hall's continued adherence to approving of using KIPs in violation of the General Orders and the Constitution demonstrates the  conscious disregard the City of Dallas and Chief Hall have for the consequences of their actions.

126.    Large-scale protests against police brutality have taken place in Dallas with increasing regularity. And each time Dallas Police officers are on the scene at such protests, they

come clad in riot gear and armed with riot control devices, and often travel in armored vehicles. Repeatedly since protests began in Dallas on May 29, 2020, Dallas Police officers have used KIPs, tear gas, flash-bang grenades, and other riot control devises against protestors who are not threatening, thereby violating the protesters' constitutional rights.

127.    The need for training officers in how to use KIPs lawfully in these recurring situations—particularly where no training has been provided—could hardly have been more obvious to the City of Dallas or Chief Hall since at least the unlawful use of KIPs against crowds in the 2018 protests following Botham Jean's death. Absent such training, it was highly predictable that Dallas Police officers would continue to violate protesters' constitutional rights. Accordingly, the City of Dallas and Chief Hall have been deliberately indifferent to the complete lack of training, or completely inadequate training, they have given Dallas Police officers.

128.    These written and unwritten policies of the Defendant the City of Dallas in failing to train the Dallas Police officers, therefore, are the moving forces behind the violations of Plaintiff's Fourth and Fourteenth Amendment rights.

129.    As a direct and proximate result of Defendants' acts and omissions as stated above, Plaintiff was deprived of her Fourth and Fourteenth Amendment rights and suffered injuries and damages.

### COUNT 6: PERMANENT INJUNCTIVE RELIEF
### Against the City of Dallas and John Doe Police Officers 1-50 in their individual capacities

130.    Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs.

131.    Additionally, and in the alternative, Plaintiff is entitled to permanent injunctive relief against Defendants.

132.     Plaintiff has suffered irreparable injury as a result of Defendant's conduct, and the failure to grant permanent injunctive relief will result in further irreparable injury. The loss of constitutional rights constitute irreparable harm, particularly where the First Amendment is concerned. Loss of First Amendment freedoms—even for minimal periods of time—constitutes irreparable injury. As demonstrated herein, the actions of DPD officers, authorized and directed by the City of Dallas, the Dallas City Council and Former Chief Hall, have had the effect of blocking demonstrators, bystanders, and press from fully exercising their First Amendment rights. Additionally, Defendants' actions chill Plaintiff's prospective exercise of her rights.

133.     Defendants' tactics also caused and continue to cause irreparable harm under the Fourth Amendment. It is well-established that using deadly force against a person who does not pose an immediate threat of serious harm violates the person's Fourth Amendment right to be free from excessive force. Firing weapons that—although allegedly *"less lethel"* than firearm rounds—are nonetheless *still* lethal constitutes excessive force when used against people who pose no immediate threat of serious harm at the time. Plaintiff and other protestors, bystanders, and press will continue to face excessive deadly force unless the City of Dallas and Dallas PD officers are enjoined from using such weapons against people who pose no immediate threat of serious harm at the time.

134.     Plaintiff is likely to succeed on the merits of her First and Fourth Amendment claims. The City's authorization of use of less-lethal weapons to control and suppress has chilled and is chilling Plaintiff's right to assemble, petition for redress of grievances, freedom of speech, and freedom of the press, and constitutes retaliation in violation of the First Amendment. The United States Supreme Court has upheld preliminary injunctions based on

the First Amendment where police action chills people from exercising their First Amendment rights. The City's policies and practices have been overbroad and underinclusive: rather than focus on arresting, the DPD has hurled canisters of tear gas and smoke at entire crowds of peaceful protestors and indiscriminately fired KIP guns at individual protestors not involved in any conduct that posed an immediate threat of serious harm at the time. The use of such excessively deadly force is not "narrowly tailored" and necessary for keeping roadways clear or for preventing property destruction—neither of which are compelling. Thus, the DPD's policies and practices do not survive strict scrutiny. Further, since the DPD's force is directed squarely at suppressing free expression—and restricts First Amendment freedoms far more than necessary to prevent an immediate threat of serious harm at the time—the policies and practices also fail intermediate scrutiny. The City's actions also violate the Fourth Amendment prohibition on excessive force, and the First Amendment rights at stake strengthen that claim. The City's authorization of the use of allegedly "less lethal" weapons against protestors, bystanders, and press as a means of "crowd control," absent *any* imminent threat of serious harm to anyone, is inherently excessive, and violates the Fourth Amendment.

135. Remedies available at law are inadequate to fully compensate for Plaintiff's injuries because the loss of her First and Fourth Amendment constitutional rights constitutes an irreparable harm. Furthermore, permanent injunctive relief is necessary to ensure that future harm is not inflicted on Plaintiff and others seeking to exercise their constitutional rights in Dallas. Without permanent injunctive relief to prevent Defendants from using these tactics on crowds or people not posing an immediate threat of serious harm at the time in the future, Plaintiff and others similarly situated will be chilled from exercising their constitutional rights and could potentially incur additional physical injuries caused by the Defendants.

136.     Considering the balance of hardships between Plaintiff and Defendants, a remedy in equity is warranted here. Plaintiff's injuries and the likelihood of future injuries to Plaintiff and other peaceful protestors similarly situated outweigh any damage that the injunction will cause Defendants. Dallas PD's and John Doe Officers 1-50's use of allegedly "less lethal" devices to control crowds during protests harms not just the Plaintiff in this lawsuit but many similarly situated people seeking to exercise their First Amendment rights, including members of the press. Rather than develop a narrowly tailored policy to deal with the scarce few disruptive protestors, the City has chosen an overbroad one: punish all protestors (as well as the press who cover their demonstrations and bystanders who may be nearby) with chemical weapons such as tear gas, smoke bombs, flashbangs, Pepper Balls, mace, and KIPs such as rubber, sponge, and foam bullets—among other riot-control weapons and techniques—rather than specifically deal with any individual persons who pose an immediate threat of serious harm at the time. Whatever interest the City might have in preventing property destruction or keeping roadways safe does not and cannot justify continuing to deploy lethal weapons against peaceful protestors. Moreover, an injunction is in the public interest because public health officials have made clear that the use of chemical agents—such as tear gas, smoke bombs, Pepper Balls, and mace—poses a significant risk of spreading and exacerbating the ongoing COVID-19 pandemic. Finally, Defendants the City of Dallas and then-Chief Hall both agreed to the entry of this Court's June 11, 2020 Agreed Preliminary Injunction, indicating that the balance of hardships here does, in fact, weigh in favor of Plaintiff's request for permanent injunctive relief.

137.     Finally, permanent injunctive relief would best serve the public interest. It is always in the public interest to prevent the violation of a party's constitutional rights. Indeed,

if Defendants agree that safety is in the public interest, then it is reasonable to conclude that it is in the public interest to keep protestors, bystanders, and press safe from DPD officers using lethal force against them under the guise of keeping roads and property safe. Accordingly, granting this temporary restraining order is undeniably in the public's interest. Because the City has pursued and continues to pursue a policy of excessive force against peaceful protestors in violation of their First and Fourth Amendment rights, Plaintiff request that the Court issue an order permanently enjoining the indiscriminate use of this "less lethal" force on people who pose no immediate threat of serious harm at the time.

138.    Accordingly, Plaintiff seek permanent injunctive relief to prohibit Defendant City of Dallas, Defendant John Doe Police Officers 1-50, and all officers of the Dallas Police Department from:

- using "less lethal" weapons, such as tear gas, smoke bombs, flashbangs, pepperballs, mace, and other chemical agents in connection with protests: (a) against any protestors, bystanders, civilians, or members of the press, who are not posing any immediate threat of serious harm to anyone, or (b) using such devices or chemical agents for purposes of controlling peaceful crowds; and

- firing or deploying kinetic impact projectiles into a crowd for any purpose.

## VIII.  DAMAGES

139.    Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs.

140.    In whole or in part, as a result of some or all of the above actions or omissions of Defendants, Plaintiff has and continue to suffer irreparable harm as a result of these violations. As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered

and will continue to suffer severe pain of mind and body, emotional dress, physical manifestations of emotional distress, humiliation, loss of enjoyment of life, disfigurement, physical impairment, and loss of earnings and earning capacity. As a direct and proximate result of Defendants' acts and omissions, Plaintiff was prevented and will continue to be prevented from participating as activists and peaceful protesters with regard to causes that directly impact their lives and the lives of their friends, families, and communities. As a direct and proximate result of Defendants' actions and omissions, Plaintiff has required and will in the future require medical treatment, therapy, counseling, and/or hospitalization to address the physical and mental injuries caused by Defendants' acts and omissions.

141.     As a direct and proximate result of Defendants' actions and omissions, as stated above, Plaintiff suffered:

(a) Physical pain and suffering in the past and future;

(b) Mental anguish in the past and future;

(c) Medical expenses in the past and future;

(d) Disfigurement in the past and future;

(e) Physical impairment in the past and future;

(f) Lost earnings in the past and future;

(g) Loss of earning capacity in the past and future.

## IX.     STATUTORY DAMAGES

142.     Plaintiff is entitled to compensatory damages and punitive damages pursuant to 42 USC § 1988.

143.    As a direct and proximate result of Defendants' acts and omissions in the foregoing respects, Plaintiff has been required to retain the services of legal counsel and to incur attorney's fees and costs thereby.

144.    Plaintiff brings this lawsuit pursuant to 42 U.S.C. § 1983. Plaintiff is entitled to an award of reasonable attorney's fees. *See* 42 U.S.C. 1988.

## X.     PUNITIVE/EXEMPLARY DAMAGES

145.    Plaintiff reallege and incorporate by reference the allegations contained in the preceding paragraphs.

146.    Additionally, and in the alternative, the conduct of Defendants John Doe Police Officers 1-50 was done with malice and/or a specific intent by Defendants to cause substantial injury or harm to Plaintiff. As such, Plaintiff requests punitive and exemplary damages to deter this type of conduct in the future.

147.    In the alternative, Defendants John Doe Police Officers 1-50's heedless and reckless disregard of Plaintiff's rights, safety, and welfare constitutes more than momentary thoughtlessness, inadvertence, or misjudgment. Instead, Defendants John Doe Police Officers 1-50 acted with reckless or callous indifference to the federally protected rights, safety, or welfare of others. Defendants had actual, subjective awareness of the risks of injury or illegality involved, but nevertheless proceeded with conscious, reckless, or callous indifference to the rights, safety, or welfare of others, including Plaintiff.  Defendant Police Officers 1-50 ordered Plaintiff to comply—which Plaintiff complied, and Defendant still deployed weapons described herein against a non-resisting, nonthreatening citizen—causing serious bodily injury to Plaintiff.  Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiff request punitive and exemplary damages are awarded against Defendants John Doe Police

Officers 1-50 in a sum which is within the jurisdictional limits of this court.

## XI.       JURY TRIAL DEMANDED

148.     Plaintiff asserts her rights under the Seventh Amendment to the U.S.

Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury

on all issues so triable.

## XII.       PRAYER

149.     WHEREFORE, Plaintiff request this Court and the finder of fact to enter a

Judgment in Plaintiff's favor against all named Defendants on all counts and claims as indicated

above in an amount consistent with the proofs of trial, and seeks against Defendants all

appropriate damages arising out of law, equity, and fact for each or all of the above counts where

applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all

applicable damages, including but not limited to compensatory, special, exemplary and/or

punitive damages, in whatever amount Plaintiffs are entitled, and all other relief arising out of

law, equity, and fact, also including but not limited to:

(a) Compensatory damages in an amount to be determined as fair and just under the

circumstances, by the trier of fact including, but not limited to pain and suffering,

medical expenses, loss of earnings and earning capacity, mental anguish, anxiety,

humiliation, and embarrassment, violation of Plaintiff's Federal and State rights, loss

of social pleasure and enjoyment, and other damages to be proved;

(b) Statutory compensatory damages and punitive damages pursuant to 42 USC § 1988;

(c) Statutory attorneys' fees and costs pursuant to 42 USC § 1988;

(d) Punitive and/or exemplary damages in an amount to be determined as reasonable or

just by the trier of fact;

(e) Reasonable attorney fees, pre-judgment and post-judgment interest, and costs; and

(f) Other declaratory, equitable, and/or permanent injunctive relief, as appears to be

reasonable and just.

Respectfully Submitted,

By: */s/ Billy Clark*
**Billy Clark**
TX Bar No. 24110664
*Admitted*
**THE CLARK LAW FIRM**
P.O. Box 4682
Cedar Hill, Texas 75106
214-725-2750 (Phone)
877-312-5118 (Fax)
billy@clarklawfirmtexas.com

**ATTORNEYS FOR PLAINTIFF**
**SHENITA CLEVELAND**

### CERTIFICATE OF SERVICE

Because Plaintiffs are concurrently filing a Motion for Temporary Restraining Order, pursuant to the Federal Rules of Civil Procedure, this Court's Local Rules, and agreement of counsel, a true and correct copy of the foregoing *Plaintiffs' Original Complaint and Jury Demand* was served on the following via email:

**Christopher Caso**
City Attorney
chris.caso@dallascityhall.com
**Tatia R. Wilson**
Executive Assistant City
Attorney
tatia.wilson@dallascityhall.com

**DALLAS CITY
ATTORNEY'S OFFICE**
1500 Marilla St., 7DN
Dallas, Texa 75201
(214) 671-9553 (P)
(214) 670-0622 (F)

*/s/ Billy Clark*